RUDIN v. KING-RICHARDSON CO.

Circuit Court of Appeals, Seventh Circuit. December 31, 1929.

Rehearing Denied March 17, 1930.

No. 4127.

Louis G. Caldwell, of Chicago, Ill., for appellant.

Edward W. Everett, of Chicago, Ill., for appellee.

Before ALSCHULER, PAGE, and SPARKS, Circuit Judges.

SPARKS, Circuit Judge (after stating facts as above). ■ Most of the questions involved herein as raised and discussed in the arguments and briefs, depend for solution upon a construction of the contracts—whether they constitute an agreement of agency or of sale. Most of the cases in which such questions have arisen have been cases where the rights of creditors of the parties were involved. Here there is no such question, and in this case we must therefore look to the contracts themselves and the acts of the parties thereunder in order to determine the intention of the parties in relation thereto.

■ When appellant first became manager of the Chicago branch, under the contract of January 1, 1914, he was placed in charge of a going concern which was owned by, and conducted under the name of, appellee, and had been for many years; and the contract at that date referred to him as an agent. There was no claim on his part, and never has been, that he sustained any other relationship to appellee, either under the original contract or any of the supplemental agreements which were executed prior to December 23, 1920. The books were all shipped to the Chicago branch under appellee's name; the bank account was carried in that name; all the contracts of the employees of the Chicago branch, and all the individual subscribers' contracts for books, were made in appellee's name, as was also the lease for the premises. Appellant was required to pay for only the books he had sold, and those remaining unsold at the end of the year were carried on the inventory for the ensuing year.

During the latter part of 1920 a sharp controversy arose between the parties relating to the prices which appellee was charging appellant for "Bible Story." Appellant vig-

orously demanded a reduction in price, and threatened appellee with suit for damages and with termination of his contract of employment. This led to, and resulted in, the supplemental agreement of December 23, 1920, which appellant claims terminated his agency and constituted him a purchaser. With this contention we cannot agree. The contract of December 23, 1920, was made for the express purpose of adjusting existing differences, and they were adjusted. It merely proposed to furnish appellant so many books at a certain price, provided appellant would agree to take that many books each year for two years, beginning with January 1, 1921, and pay for them as per terms of the old contract; and it further provided that appellant's agency contract be extended to December 31, 1922.

The business of the Chicago branch was carried on, and all contracts were continued or executed, in the name of appellee, and in exactly the same manner as before, until May 4, 1922. In the meantime reports and remittances were not being made by appellant; a controversy arose as to the amount due appellee for the year 1921; damages and credits were claimed by Rudin; and this situation continued until the supplemental agreement of May 4, 1922, was entered into. Likewise appellant claimed that this agreement terminated the agency contract and constituted him a purchaser thereafter. Neither can we agree with this contention. The language of the contract forbids any such construction. It was made expressly for the purpose of adjusting conflicting claims, and not to modify, add to, or take from the former contracts except as stated. It further stated that "none of the terms of the contracts now in existence are waived or set aside. Modifications made by this agreement are for the purpose of specifying certain deliveries and payments on the account of Rudin with said company." This is the language of appellant as well as of appellee.

The business of the Chicago branch was carried on under this contract in the name of appellee and in the same manner as before, except that the unsold books in the hands of appellant at the end of 1921 were not carried forward in the inventory of 1922, but were charged to appellant's 1921 account; and appellant had prior notice of that fact. This act certainly was not sufficient to change the contract of agency to one of sale. Appellee's, not appellant's, money was invested in the contents of the inventories, and it was only good business judgment on the part of appellee to avoid the accumulation of unsold stock. We hold therefore that under all the contracts appellant was at all times the agent of appellee. Willcox & Gibbs Co. v. Ewing, 141 U. S. 627, 12 S. Ct. 94, 35 L. Ed. 882; Champion Spark Plug Co. v. Automobile Sundries Co. (C. C. A.) 273 F. 74.

Being the agent of appellee, it was appellant's duty to exercise good faith in relation to all of his dealings with the subject-matter of the agency, and at the termination thereof to account properly and accurately for and to turn over to appellee all the property and rights intrusted to his care. We have been unable to find any evidence warranting the adoption of appellant's theory that he was the owner of the organization of the Chicago branch, or of the lease for the premises. It is true that he greatly improved the organization which appellee turned over to him, and made it more efficient, but this of itself could not convey title of the organization to him. The labor occasioned by this effort must be held to have been compensated by the remuneration he received under his contract. He was not the owner of the lease, and never claimed to own it until November 27, 1920, when he took the lease in his own name without the knowledge or consent of appellee. Equity will not permit this to be done. Appellant should have turned over the lease and the organization to appellee on demand. He might not have been able to turn over the working force of the organization, but equity cannot excuse him from this obligation until he has made an effort, in good faith, so to do. Stephens v. Gall (D. C.) 179 F. 938.

The contract does provide that under certain conditions precedent appellant shall be entitled to the accounts receivable and the books in which they are kept. These conditions are that he shall pay his indebtedness to appellee, and that he shall satisfy all just claims against the Chicago branch. These things were not done, and for this reason appellant is in no position to demand the benefit of the contract in this particular.

Appellant insists that the contracts permitted him to keep said organization and lease to the extent necessary to sell the unsold books on hand, and to make collections in the name of appellee. The contracts give no right to retain the lease and to sell books after their termination. They do give him the right to collect accounts in the name of appellee, provided he has paid appellee's claim in full and has satisfied all just claims against the Chicago branch. These provisions were not complied with.

Appellant insists that he had a right to make arrangements in 1922 looking to his continuing in business with a new publication in 1923. This we do not question, provided he did nothing in that respect, at those times, which seriously affected the present interests of appellee's business, which he had promised faithfully to serve. This right is also dependent on the further provision that he did not infringe on the time which he had promised to devote to appellee's interest. The size and completeness of his new organization, and the effectiveness of it in practically destroying appellee's business, evidently convinced the District Court that appellant had not brought himself within these provisions. We think the court was clearly right.

With respect to appellant borrowing money at the bank and executing appellee's notes therefor, which notes were also signed or indorsed by himself, it is sufficient to say that neither the contracts nor the prior conduct of the parties warranted any such conduct on appellant's part. The fact that appellant and an officer of the bank stated on the trial that they did not consider them as obligations of appellee is not a sufficient answer except as to appellant and the bank. It certainly would not be a good answer as against an innocent purchaser for value before maturity. Appellant had no right to subject appellee to any such possible liability.

In the matter of failure to make remittances to appellee, it is appellant's contention that, after he had paid appellee in full for books delivered to him during any calendar year, he had a right to withdraw his profits on books sold during that year, after such profits were collected; or, in other words, to deduct the amount owing (but not paid) to employees before making his weekly payments. The express provisions of this contract prevent this construction. Appellee was liable for the debts of the Chicago branch incurred by appellant when he was acting within the scope of his authority. He was authorized to make contracts with employees. They were made by him in writing, and appellee's name was signed to them. These obligations were not questioned. They were not paid, as appellant states, as a matter of convenience. If this be true, he must assume the obligation which such a departure from the contract lays upon him. Appellant agreed to remit and pay on each Saturday all sums received by the Chicago branch after deducting the usual, customary, and necessary expenses of said Chicago branch and also a working bank balance of $3,000. We think appellant was not warranted in deducting unpaid obligations from his weekly cash balances; but that he should have deducted only the actual expenditures and the authorized working bank balance of $3,000, and remitted the remainder each week to appellee. Appellee, under the contract, was entitled to this protection.

Appellant contends that appellee's obligation to bill supplies to him at cost did not permit appellee to include "overhead"; and that, in any event, the amount so charged as "overhead" was excessive. Overhead is a part of the cost of production of any manufactured article. Whether the charge therefor in this case was excessive was found adversely to appellant, and the court adopted that finding. We cannot disturb it.

We are unable to agree with appellant's contention that the term "single volumes" should be construed to include "odd volumes" for broken "Bible Story" sets. We think the District Court ruled correctly in deciding this question adversely to appellant.

Appellant contends that under the contract appellee was obligated to furnish to appellant, in 1922, the number of books ordered, and that that number was not dependent upon appellant's probable sales for that year. He bases this contention on the supplemental agreements executed December 23, 1920, and May 4, 1922. These agreements are not to be construed alone, but in connection with the prior contracts between the parties. By express terms the prior contracts are made a part of the last two agreements, except wherein they are inconsistent. Prior to December 23, 1920, both parties understood that appellee was to deliver no more books in any one year than appellant could probably sell in that year. For some time in the latter part of 1920 appellant had complained vigorously of appellee's prices, and had threatened to terminate his contract with appellee if a reduction in price were not made. It was under these circumstances that appellee proposed by letter, on December 23, 1920, to make certain prices to the Chicago and Springfield branches if they would take 20,000 sets each year for two years and pay for them as per terms of "your contract." There being no terms of payment in this proposition, this statement without doubt refers to the former contracts. This contract also provides that, if appellant took more than 20,000 sets in each year, the price would be decreased; and if he took less than 20,000 sets, the price would be increased. Appellant was not bound to take any definite number, and

it is quite evident that appellee did not know how many appellant would take. This proposition was accepted by appellant, and, of course, both parties were bound by it; but we are of the opinion that it did not materially change the prior contracts, except as to prices, and that appellee was under no obligation to furnish appellant more books for each year than appellant would reasonably need for sale in that particular year.

Prior to the execution of the contract of May 4, 1922, appellant had been complaining greatly of appellee's failure to ship books, and there were other serious differences between the parties; and it was under these circumstances that the parties entered into the agreement of that date, for the express purpose of "adjusting claims, and not to modify, add to or take from the former contracts." It was agreed therein, on the part of appellee, to deliver certain specified sets, and also to ship others in carload lots if ordered by appellant. This, in our opinion, was not sufficient to warrant appellant in ordering more books than he could reasonably expect to sell up to and including December 31, 1922, that being the date of the expiration of the contract. The reasons for this construction seem to us to be very cogent. This had been their own construction prior to 1921. Appellant had not sold all of the books delivered to him in 1921. He had never before sold so many books in any one year as he ordered in 1922. He did not intend to sell in 1922 all the books ordered in that year, and he had no right to sell them after 1922. Appellant was not paying on his account as he had agreed. Appellee was, and had been, protesting against unnecessarily tying up its capital in frozen assets, either by inventory or long running accounts.

The interests of both parties herein should be, and we think are, determinative of their intentions. We can see no reason, under the contracts, why either party should desire such a construction on this phase as that asked by appellant. The reason for such demand, of course, is not based on any right under the contract, but it is based on the fact that appellant was, by that construction, attempting to secure a sufficient stock of books for sale to keep his new organization going until his new publications should be on the market. This he had no right to do. Appellant and the Springfield branches having sold less than 15,000 sets during 1922, appellant was chargeable with $1 per set extra for the 7,701 sets which appellee delivered to him in that year.

That appellant was liable to appellee for interest on remittances withheld in 1922, we have no doubt. The computation is accurate, and the court was fully justified in charging appellant with this item.

That appellant violated his contract with appellee in the many respects stated in the decree there can be no question, and no good purpose can be served by repeating them. We hold that these violations were sufficient to justify appellee in refusing to deliver books to appellant.

It is strenuously insisted by appellant, however, that he should not be charged with $26,726.20 which he says represents the contract price of 2,692 sets remaining unsold out of the Springfield carload, plus $1 per set. This statement is at least confusing. This amount does not represent the contract price; it represents damages which the court found appellee sustained by reason of being prevented by appellant from selling the books. It is true that appellant wanted, and tried, to take them, but he had violated his contract, and appellee refused to deliver. To have delivered them to appellant would only have furthered the conspiracy to ruin appellee's business. We must bear in mind also that appellee was a publisher, and disposed of its product only through branch offices. It was well within its right, when it refused to deliver the Springfield carload to appellant, in thinking that it could dispose of those books through other branch offices. In any event, it was not, under the circumstances, obligated by law to deliver them to appellant. Later, when the facts were fully developed, it was found that appellee had neither branch offices nor agents. There was no accessible market for appellee's unsold books. Thus was appellee damaged by not being able to sell the books on hand at Springfield, and it had no opportunity of minimizing such damage. The court found that appellant was the cause of that damage, and measured it by the price which appellant had agreed to pay for the books under his contract, and ordered them delivered to appellant. In this we think the court was right, and by the order of delivery protected appellant as much as the circumstances warrant.

We have examined the contents of the various tenders made by appellant, and are not disposed to set them out in this opinion. They were either insufficient in amount or substance, or the principal amounts of such tenders were procured by notes to which appellant had unlawfully signed appellee's name. By reason of these facts, and the fur-

648

ther fact of appellant's violations of the contract, the tenders were of no avail to appellant.

 The fact that appellee continued to fill appellant's orders after it had knowledge that appellant had, in some respects, violated his contract, would not preclude it from relying on these same violations after other and more serious violations had been revealed to appellee. Champion Spark Plug Co. v. Automobile Sundries Co. (C. C. A.) 273 F. 74. Likewise, certain allegations of violation in the original bill would not prevent appellee from inserting others in its amended bill, of which it had no knowledge, or not sufficient knowledge, at the time it filed the original bill, and which were for the first time revealed to it under an order of the court. Farmer v. First Trust Co. (C. C. A.) 246 F. 671, L. R. A. 1918C, 1027.

Under all the circumstances surrounding the relations of the parties to this case, covering a period of many years, we are not inclined to make an allowance to appellee for attorneys' fees or for the expenses incurred in making an audit of the books.

What has herein been said necessarily leads us to the conclusion that appellant can recover nothing on his counterclaim.

The judgment is affirmed.