PER CURIAM.
Cherokee Electric Cooperative, Arab Electric Cooperative, Joe Wheeler Electric Membership Corporation, Marshall-DeKalb Electric Cooperative, North Alabama Electric Cooperative, and Sand Mountain Electric Cooperative (the Cooperatives), appeal from a judgment of the Circuit Court of Cherokee County holding valid municipal business privilege taxes assessed by municipalities[1] on the cooperatives. The cooperatives all distribute power obtained from the Tennessee Valley Authority (TVA) to residents in the respective municipalities. The primary issue is whether the cooperatives are “franchises” of the TVA and are therefore immune from taxation.[2] Tennessee Valley Authority Act, 16 U.S.C. § 831 (1985).
Section 13 of the TVA Act, 16 U.S.C.A. § 831⅞ states:
“The payments herein authorized are in lieu of taxation, and the Corporation [the TVA], its property, franchises and income, are hereby expressly exempted from taxation in any manner or form by any state, county, municipality, or any subdivision or district thereof.”
Until the present controversy arose, several of the plaintiff municipalities had collected the business privilege tax for as many as 50 years without complaint from the cooperatives. However, in 1991 the District Court for the Northern District of Alabama held, in an unpublished opinion, that the City of Cull-man could not impose a business privilege tax on the Cullman Electric Cooperative, because to do so, it held, would violate the tax exemption provisions of the TVA Act. Cullman Electric Cooperative v. City of Cullman, No. CV-91-N-665-NE, 1991 WL 639132 (N.D.Ala., Aug. 30, 1991). Following that federal court decision, the cooperatives informed the municipalities they served that they would no longer pay the municipal business- privilege taxes. The municipalities filed a complaint seeking a judgment declaring that the business privilege taxes were valid.
I.
The Circuit Court of Cherokee County ruled, in a well-reasoned order, that the cooperatives were not franchises of the TVA and therefore were not exempt from taxation. The order of the Cherokee County Circuit Court, as quoted below, is hereby adopted by this Court as part of this Court’s opinion, as that order relates to the issue of whether the municipalities could properly tax the cooperatives:

*753
‘ORDER

“Under [Section] 11-51-90, -91 Code of Alabama (1975), municipalities are authorized to impose license taxes on businesses which operate within their city limits or police jurisdiction. Among the businesses taxed by the municipalities are the defendant electric cooperatives, which purchase electric power from the Tennessee Valley Authority for resale within their city limits or police jurisdiction.
“Under 16 U.S.C. § 831/ (hereinafter referred to as Section 13) of the TVA Act, the Tennessee Valley Authority, ‘its property, franchises and income, are ... expressly exempted from taxation in any manner or form by any state, county, municipality, or any subdivision or district thereof.’ The defendant cooperatives, therefore, contend that they, as ‘franchises’ of TVA, are exempt from taxation by the municipalities which they serve. The term ‘franchise’ is not defined by the TVA Act.
“Under 16 U.S.C. § 831i (hereinafter referred to as Section 10) of the TVA Act, TVA is authorized to sell its surplus power ‘to States, counties, municipalities, corporations, partnerships or individuals,’ for resale by such entities on the terms and conditions established by TVA. The defendant cooperatives in this case have power distribution contracts with TVA. Under those contracts the cooperatives buy electricity from TVA and resell it to the customers of the cooperatives. The term ‘franchise’ is not, however, used or defined in the contracts between TVA and the cooperatives.
“The cooperatives were all created and operate under general Alabama State Law.[1] As power distributors the cooperatives may generally acquire, construct, and maintain power distribution systems. Such systems generally include, among other things, land, buildings, and other structures. Such business and facilities would, unless exempt, be subject to taxation under Alabama law.[2]
“When the Tennessee Valley Authority was established in 1933, it acquired previously investor-owned utilities which had generated substantial tax revenues in Tennessee and Alabama. As an instrumentality of the federal government, however, TVA was constitutionally exempt from such taxation.[3] Accordingly, the TVA Act was amended in 1940 to provide for payments by TVA to state and local governments ‘in lieu of taxation.’ To this day, TVA continues to make payments in lieu of taxes to the state and local governments ‘in which the Corporation ... acquired properties previously subject to state and local taxation.’ The clear intent of Section 13 was to assure that the tax revenues lost by state and local governments by virtue of acquisition of property by TVA would be replaced, at least in part, by payments in lieu of taxes.[4]
“What is left unclear under Section 13 is whether TVA power distributors are exempt from taxation. Following that portion of Section 13 providing a formula for in-lieu-of-tax payments by TVA, to state and local governments, Congress reiterated that TVA, ‘its property, franchises and income, are hereby expressly exempted from taxation.’
“The defendant cooperatives contend that they are ‘franchises’ of TVA, and therefore exempt from taxation. The defendants even seem to contend that all distributors of TVA power are franchises of TVA At the very least, the defendants blur any distinctions between cooperatives and municipalities. This 'Court is of the opinion that this distinction is an important consideration in determining whether distributors of TVA power are ‘franchises’ of TVA.
“Under Paragraph 4 of Section 13, TVA is authorized to provide in its contracts with municipal power distributors, for the resale of power by such municipalities at rates which may include an amount to cover tax equivalent payments to the municipality ‘in lieu of ... taxes upon any distribution system or property owned by the municipality.’ This Court is not aware of any provision of the law which authorizes a municipality to tax its own.assets, or income and, in effect, pay taxes to itself; however, under this provision, a municipal distributor is authorized to charge its eus- *754 tomers a rate which would generate a ‘tax equivalent’ revenue for the municipality.
[[Image here]]
“Section 10 authorizes TVA to set the rates for the resale of power by the distributors. In setting their rates, TVA considers the operational and other costs incurred by its distributors. Under section 6 of the TVA contracts with municipal distributors that includes ‘tax equivalent’ payments. Under section 6 of the TVA contracts with cooperatives that includes ‘taxes.’
“Under the theory argued by the cooperatives in this case, municipalities which are served by electric cooperatives would lose tax revenue and recover no in-lieu-of-tax payments, while municipalities which are themselves power distributors, or are served by municipal power distributors, would receive such revenue. Congress could not have intended this unequal and unfair result.
“Because Section 10 of the TVA Act allows States, counties, municipalities, corporations, partnerships, and individuals, to purchase power from TVA for resale, each of these entities would be exempt from taxation as a franchise of TVA under the argument asserted by the defendant electric cooperatives in this case. If the Alabama Power Company buys electricity from TVA for resale, surely the Alabama Power Company would not thereby be exempt from taxation as a franchise of TVA
“The reason that municipal power distributors are specifically dealt with under Paragraph 4 of Section 13 is because of their distinct nature. Municipalities could not tax themselves,[5] and there may be a restriction on the authority of one municipality to tax another.[6] Just as Congress did not want state and local governments to be penalized by the TVA acquisition of power generating facilities, Congress did not want municipalities to be penalized by municipal acquisition of power distributing facilities.
“In City of Tullahoma v. Coffey [Coffee] County, Tennessee, 328 F.2d 683 (6th Cir. 1964), the Sixth Circuit Court of Appeals undertook to construe Section 18 of the TVA Act. In doing so the Court considered the language of the statute, legislative history, administrative interpretation, and acquiescence by Congress. In the instant ease the parties have established an extensive record, and have filed extensive briefs addressing each of these areas for interpretation of Section 13 under the facts of this case.
“The statutory language of Section 13 provides no guidance to aid the Court in construing the term ‘franchise.’ In City of Sheffield v. Town of Cherokee, No. 89-AR-5073-NW (N.D.Ala, Dec. 12, 1989), Judge Acker opined that the meaning of the term is ‘far from clear.’
“From the very earliest history of this country, the term ‘franchise’ has been recognized as a government charter to conduct certain types of activities. See McCullough [M’Culloch] v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579, 599 (1819). In Sheffield, Judge Acker acknowledged this long-standing definition of the term when he stated:
“ ‘Long before the term became used in distributorship relations, a “franchise” was known as a special privilege conferred upon individuals or corporations by government authority to do something that could not be done of common right. Bank of Augusta v. Earle, 38 U.S. [(13 Pet.)] 519 [10 L.Ed. 274] (1838).’
“It is this general definition of the term ‘franchise’ which existed at the time of the creation of the Tennessee Valley Authority-
“TVA is a federally chartered corporation created ‘in the interest of the national defense, and for agricultural and industrial development, and to improve navigation ... and to control the destructive flood water in the Tennessee River and Mississippi River Basins.’[7] The TVA was granted the authority to do that which could not be done without such ‘special privilege conferred’ by the United States Congress. TVA was granted a charter to exercise the power of government. TVA’s charter and its powers thereunder constitute the ‘franchises’of TVA
*755 “The defendant cooperatives argue that their authorization to distribute power, which arises from their power distribution contracts between the cooperatives and TVA, gives them status as ‘franchises’ of TVA
“In Griffin v. Oklahoma Natural Gas Co., 37 F.2d 645 (10th Cir.1930), the defendant argued that a contract for the supply of natural gas between the City of Ida, Kansas, and Oklahoma Natural Gas Corporation was void because Kansas law provided that ‘No person, firm or corporation shall ever be granted any exclusive franchise, right or privilege whatever.’ The contract provided that Oklahoma Natural Gas was to be the sole supplier of gas for the City ‘in the operation of the [City’s] electric light and water works power plant, and the City agreed to use only natural gas for fuel in the operation of such power plant.’ The Griffin court held that a contract of supply from one utility for use by another utility is not a franchise. Although the Griffin case predates the creation of TVA, it was the most pertinent statement of the legal relationship between a utility supplier and its distributor existing at the time of the enactment of the TVA Act.
“The power distribution contracts between TVA and the cooperatives provide that the contracts are ‘subject to the TVA Act.’ TVA has included in its standard contracts with its distributors provisions requiring that they conduct their activities so as to carry out the federal objectives expressed in the TVA Act. The Courts have consistently held that power distributors must comply with the controls included in the power contracts.[8]
‘Although this Court recognizes that the conduct of the cooperatives is highly regulated, the relationship between TVA and the cooperatives, as well as the ‘control’ of TVA over a cooperative’s activities, arises from these contracts, and it is on the basis of general contract law that these controls have long been upheld by the Courts.[9] The mere exercise of ‘control’ by TVA over a power distributor’s activities under a contract does not create the relationship of franchisor and franchisee as [those terms were] known and used when TVA was created.
“In Alabama Power Co. v. Alabama Electric Coop., Inc., 394 F.2d 672 (5th Cir.), cert.denied, 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968), the Rural [Electrification Administration] (REA) proposed to make a loan to the Alabama Electric Cooperative (AEC) to finance the construction of power generating and distribution facilities. As security for the loan, REA required AEC to enter into 35-year contracts with each of the fourteen electric cooperatives which the AEC would serve. The court held the AEC was immune from suit under federal antitrust laws for doing that which it was required to do by the [REA], Because the [REA] is immune from suit under the antitrust laws, a borrower which complies with the [REA] loan requirements is likewise immune as an ‘instrumentality of the United States.’
‘Although the defendant electric cooperatives cite the Alabama Electric Cooperative case to support their argument that the cooperatives are franchises of TVA, the cooperatives do not argue that they are immune from taxation as instrumentalities of the federal government. In other words a cooperative’s immunity under the Alabama Electric Cooperative case is limited to the narrow facts of that case and similar litigation.[10]
“When Congress amended the TVA Act in 1940, it was reacting to the need to ensure to the States an income stream to replace tax revenue that would be lost by federal acquisition of previously investor-owned electric utilities. During the Congressional hearings on this subject, there was an expressed concern that the language authorizing such payments ‘in lieu of taxation’ was a tacit or implied recognition by Congress that TVA was subject to taxation.[11]
“After discussing the then existing policy and practice of sharing with States the revenue from the sale of forest products from federally owned land, and royalties under federal oil and mineral leases, there was the following exchange between Congressman Joseph Smith of Connecticut and *756 Mr. William C. Fitts, general counsel of TVA:
“ ‘Mr. Smith. In none of those statutes, however, does the Federal Government admit that property held by it for Federal purposes is taxable by the State?
“ ‘Mr. Fitts. Oh, no.
“ ‘Mr. Smith. Does not this language on page 2, in which you say “to be made upon condition that no State, county, or local taxes shall be assessed or levied against the property, operations, or business of the corporation” make an admission that there may be a right in the State, county, or locality to tax this property which is held, as we claim, for a Federal purpose?
“ ‘Mr. Fitts. Of course, I do not think so, and, if it does, I should like to see it changed.
“ ‘Mr. Smith. Should not that language be stricken out and any such apparent admission definitely denied in any legislation we enact granting payment in lieu of taxes?
“‘Mr. Fitts. I think it should. What that language is intended to do, and I think it does, but we can make it much more explicit, and the more explicit the better pleased I am, certainly — but what that language is intended to do is to make clear that Congress is asserting this property is immune and exempt from State and local taxation.
“ ‘Mr. Smith. It should so state.
“ ‘Mr. Fitts. And that this is a voluntary in-lieu payment, and recognizing that.
[[Image here]]
“ ‘Mr. Smith. This language, then, that such payments shall be made upon condition that no State taxes shall be levied does not occur in those acts, does it?
“ ‘Mr. Fitts. I do not think so.
“ ‘Mr. Smith. Do you recall any others?
“ ‘Mr. Fitts. I do not think so. I think that language can probably be omitted by saying this property shall remain exempt from State taxes.’[12]
“This dialogue is the principal exchange in which there was a discussion about eliminating the ‘admission’ that TVA was subject to taxation. The provision in question was replaced with the Congressional reaffirmation that TVA, ‘its property, franchises and income’ are exempt from taxation, and Mr. Fitts later testified that by making this change Congress was ‘asserting the Federal exemption from taxation for this property.’[13]
“The Congressional record is replete with evidence that both before and after the above-quoted testimony, Congress intended for cooperatives to remain subject to state and local taxation. Testifying before Congress in 1939, William C. Fitts, as then solicitor of TVA, stated that if there was going to be a tax loss to states and local governments by virtue of municipalities and cooperatives acquiring power distribution facilities, that matter should be left to the state government. He opined that properties that were to be acquired by state agencies, municipalities and cooperatives would be ‘clearly taxable by the states just as the private utilities were before.’[14]
“When the bill was introduced, Congressman John Sparkman introduced into the record a letter from the Chairman of the Board of TVA which stated in part:
‘“[T]he only subject dealt with in this recommended draft of bill is the Federal Government’s contribution on property it owns; the contribution to the State and local subdivisions by municipalities and other public agencies owning their own electric facilities is, of course, not included in these computations nor covered by this proposed bill.[15]
“In support of the bill, William C. Fitts, as general counsel of TVA, testified before the House Committee as follows:
“ ‘[T]he rural distribution lines were sold not to the TVA but to the cities and rural cooperative associations. Now, those properties you are not to be concerned with ... because the State can tax those properties.... They are owned by State agencies and are still subject to State taxation....’[16]
*757 “Before the Senate Committee one month later Mr. Fitts reemphasized his position on this subject in the following exchange:
‘“Mr. Fitts_ The generating and transmission properties were transferred to the TVA and acquired and held in the name of the United States. So that those properties are not now subject to State taxation, and it is those generating and transmission properties that raise the problem that we are dealing with here. But the distribution properties, which constituted the larger part of the system in value and in taxable value, the distribution properties were transferred either to municipalities or to rural cooperative associations, and are held and operated by them.
“ ‘Senator Norris. And owned by them.
“ ‘Mr. Fitts. And owned by them. And of course, they remain subject to State taxation, while the legislation in all of the States does not cover them, the State has the power to levy taxes on those properties and can recover those taxes. So that is not a Congressional problem. It is a problem to be solved by the States through their own legislatures.[17]
“Immediately following the Senate’s agreement to the amendment involving the franchise exemption, Senator George W. Norris of Nebraska explained that the bill involved only the property of the federal government, not the property of municipalities or cooperatives.[18]
“Not only does the legislative history support the conclusion that Congress intended for cooperatives to remain subject to State and local taxation, the power distribution contracts between TVA and each of the cooperatives include a provision at section 6(a) that cooperatives may use their gross revenues for, among other things, the payments of taxes. Each year the TVA reviews cooperatives’ expenditures, including tax payments, and, each year, the TVA sends its report to Congress.
“In 1944, when TVA gave its required report to Congress, TVA stated:
“‘The electric cooperatives are private corporations and are subject to taxation unless specifically exempted. In Alabama the cooperatives are subject to State and local taxation on a basis comparable with other private business en-terprises_’[19]
“For approximately fifty years the contract provision authorizing cooperatives to pay taxes has remained intact.
“The defendant cooperatives have been unable to furnish this Court with any legislative history or administrative interpretation which evinces a Congressional intent or administrative interpretation contrary to that which has been set out hereinabove. The defendant cooperatives purport to rest their case, in large part, on a series of unpublished decisions originating in the Federal District Court for the Northern District of Alabama.
“The pivotal case on which the defendant cooperatives rely is City of Sheffield v. Town of Cherokee, CV-89-AR-5073-NW [1989 WL 513216] (N.D.Ala., October 12, 1989). In this case Sheffield sold its TVA-supplied electricity to the Town of Cherokee. When Cherokee sought to collect a gross receipts tax under its city ordinance, Sheffield filed suit to have the court determine whether such tax was payable by Sheffield.
“It is important to note that the Sheffield case involves a municipal distributor of power rather than a cooperative distributor of power. Citing the case of Town of Mulga v. Town ofMaytown, 502 So.2d 731 (Ala.1987), the Sheffield court noted that under Alabama law one municipality may not tax another unless the other is exercising a proprietary or business function within the jurisdiction of the first. Since Sheffield was not selling electricity for a profit, Sheffield would not be subject to taxation. In other words, the Sheffield court reasons that municipal power distributors of TVA are ‘contractually bound to operate their facilities at a zero profit margin, hence not making revenue,’ and are therefore exempt from local taxation.
“The case of Town of Courtland v. Town of North Courtland, No. CV-90-L-1346 *758 NE [1990 WL 605345] (N.DAla., Dee. 28, 1990), also involved a municipal distributor of TVA power, and in that court’s single-page order [it] adopted the ‘nonprofit’ rationale of Sheffield and held that the Town of North Courtland could not impose a tax on the Town of Courtland’s electric operation.
“While the Courtland case was before the federal district court, corresponding litigation was proceeding in the state circuit court. The state court granted a summary judgment in favor of the power distributor after ‘having considered the contract ... between [TVA] ... and the Town of Courtland, ... the rationale of ... Sheffield, ... and the [federal court] order ... in Courtland.’ In Town of North Courtland v. Town of Courtland, 597 So.2d 1336 (Ala.1992), the Supreme Court of Alabama ruled that the state circuit court was ‘justified in relying on the [federal courts’] recognition ... that § 831Z prohibits a municipality from levying “a tax against another municipal corporation which operates an electric operation on a non-profit basis pursuant to the TVA Act.” ’ Clearly, neither the state trial court, nor the Alabama Supreme Court, considered the record which has been constructed in the instant case. If such a record had been before the court, no summary judgment would have been entered at the trial level, nor upheld on appeal.
“The case of Cullman Electric Cooperative v. City of Cullman, CV-91-N-665-NE [1991 WL 639132] (N.DAla., August 30, 1991), involved a cooperative distributor of power. That court, however, failed to recognize any distinction between municipal and cooperative power distributors, and extended the Sheffield decision to all nonprofit distributors of TVA power.
“The TVA specifically provides in section 6 of its contracts with municipal distributors that such distributors may make ‘tax equivalent’ payments to the municipalities which they serve. The TVA specifically provides in section 6 of its contracts with cooperative distributors that such distributors may make ‘tax’ payments. For the Cullman Electric court to hold that a cooperative is contractually precluded from paying such taxes ignores the clear language of the contract.
“This Court is of the opinion that if the Sheffield decision is correct, it is correct because of the legal principles pertaining to the taxation of one municipality by another, and on the basis of the language of paragraph 4 of Section 13. Unfortunately, however, the Sheffield court sought to support its result by concluding that a municipal power distributor is a ‘franchise’ of TVA.
“The Sheffield case, and others following it, are simply not supported by the definition of a franchise existing at the time of the enactment of the TVA Act, nor by the judicial precedent of that time defining the relationship between a utility supplier and a utility distributor. Sheffield fails to consider the substantial legislative history, administrative interpretation, and Congressional acquiescence concerning the payment of taxes by cooperative power distributors.
“This Court is of the opinion that the Sheffield decision is wrong, but, even if it is not wrong, it certainly has no application to the instant case, because the instant case involves the taxation of cooperatives by municipalities, rather than the taxation of municipalities by other municipalities.
“Distributors of TVA-supplied electricity are simply not franchises within the meaning of Section 13 of the TVA Act.
“On the basis of the findings of this Court, whether set out herein, or not, it is
“ORDERED, ADJUDGED, AND DECREED, as follows:
“1. The defendants are subject to the imposition of municipal license taxes under [Sections] 11-51-90, -91 Code of Alabama (1975).
“2. The license taxes imposed by the members of the plaintiff class and the plaintiff intervenors, on the defendant cooperatives, pursuant to [Sections] 11 — 51— 90, -91 Code of Alabama (1975), are valid under state and federal law.
“3. The parties shall advise this Court, within 15 days, of their respective proposals for the scheduling of the final hearing *759 on the plaintiffs’ claims for damages and other relief.
“4. The parties shall advise this Court, ■within 15 days, of their respective positions as to whether there is any just reason for delay in making this Order a final order under Ala.R.Civ.P. 54(b).
“DONE this day, July 23,1993.
“/s/ David A Rains, Circuit Judge
*760 The Supreme Court of Georgia reached this same result, employing substantially the same reasoning, in a case on all fours with this one. North Georgia Electric Membership Corp. v. City of Calhoun, 264 Ga. 769, 450 S.E.2d 410 (1994), cert. denied, — U.S. —, 115 S.Ct. 1960, 131 L.Ed.2d 852 (1995). Thus, cooperatives distributing TVA electricity in Georgia are subject to municipal taxation. We agree with both the Circuit Court of Cherokee County and the Supreme Court of Georgia that, in the phrase “its property, franchises, and income,” the word “franchises” refers to franchises granted to TVA by the federal government, not franchises in the more modern sense of “distributorships” that might encompass distribution rights granted by TVA to cooperatives. The cooperatives not being “its [TVA’s] franchises” within the meaning of § 13 of the TVA Act, there is no basis for holding them exempt from taxation.
Therefore, we hold in appeal number 1930949 that the electric cooperatives are not franchises of the TVA, and are subject to municipal taxation.
II.
In appeals 1930788 and 1931057 the Town of Gaylesville and the City of Arab argue that their tax ordinances, which were invalid at the commencement of this litigation, should be applied retroactively.
From 1970 to 1975, the City of Arab had a valid business license tax ordinance that taxed electric utilities. In 1975, the City of Arab enacted a new ordinance that omitted electric utilities from the business license tax. The 1975 ordinance was replaced in 1986; the 1986 ordinance also failed to include electric utilities in the schedule of taxable businesses. It was not until 1993, late in the pendency of this litigation, that the City of Arab passed an ordinance that imposed a business license tax on electric utilities.
The Town of Gaylesville filed this action as a class representative on January 23, 1992, alleging that it was a municipality that taxed electric cooperatives. In response to discovery requests, the Town of Gaylesville admitted to the circuit court that it had no valid tax ordinance that taxed electric cooperatives. This admission was made on November 3, 1993. On December 15, 1993, the Town of Gaylesville passed an ordinance that imposed a gross receipts tax on electric cooperatives.
Both municipalities passed tax ordinances applying to electric utilities during the pendency of this case, and they seek to apply the new tax ordinances retroactively. The circuit court, after deciding that the new tax ordinances were valid, ruled that they could not be applied retroactively. We agree.
The two municipalities assert that the tax ordinances should be applied retroactively. This argument is predicated upon the assertions that the Cooperatives have always paid the tax, that they have always expected to pay the tax, and that it will not unduly burden the Cooperatives to pay the tax under a retroactive ordinance.
The Cooperatives argue in response that the ordinances upon which the City of Arab and the Town of Gaylesville rely cannot be applied retroactively. They argue, in substance, that the new tax ordinances were not rate modifications that could be retroactively applied, but were instead wholly new taxes imposed upon a new class of taxpayers and, as such, cannot be retroactively applied.
Alabama Code 1975, § 40-10-164 (1993), states:
“In case of the payment of money under mistake of law or fact upon any illegal tax assessment made under color of any law, special or general, of the state, or by any of its political subdivisions, authorizing the assessment or collection of taxes for any purpose whatever ... the same shall be recoverable by appropriate proceedings against the proper parties or their successors, with the usual rights of appeal, and *761 that such payment was not made under compulsion or protest shall be immaterial.”
That portion of § 40-10-164 providing for the recovery of monies mistakenly paid to taxing authorities supports the Cooperatives’ position that the fact that they paid money when there was not a valid tax ordinance does not justify allowing the retroactive application of the new tax ordinances of the City of Arab and the Town of Gaylesville.
Taxing statutes must be construed most strictly against the taxing authority and most favorably for the taxpayer. Alabama Farm Bureau Mut Cas. Ins. Co. v. City of Hartselle, 460 So.2d 1219 (Ala.1984). We are not persuaded by the authorities cited by the Town of Gaylesville and the City of Arab for their argument that the ordinances should be applied retroactively. Nor are we persuaded that the savings clause of the 1986 ordinance of the City of Arab is sufficient to justify the application of the City of Arab’s 1986 ordinance to electric utilities; conditions for the application of the savings clause were not met.
Accordingly, we affirm the circuit court’s judgment holding that the tax ordinances of the Town of Gaylesville and the City of Arab are valid but that they may not be retroactively applied.
1930788 — AFFIRMED.
1930949 — AFFIRMED.
1931057 — AFFIRMED.
MADDOX, ALMON, SHORES, KENNEDY,* INGRAM, and COOK, JJ., concur.
HORNSBY, C.J., and HOUSTON, J., concur specially.

. The City of Centre, the Town of Gaylesville, and the Town of Leesburg were the class representatives, representing 37 similarly situated municipalities, in the class action filed against the cooperatives. The Cities of Arab, Boaz, Bridgeport, and Stevenson and the Town of Falkville intervened in the action.

. We note that a similar issue was addressed in Town of North Courtland v. Town of Courtland, 597 So.2d 1336 (Ala.1992). Town of Courtland involved one municipality, North Courtland, taxing another municipality, Courtland, for distributing TVA electricity on a nonprofit basis to the residents of North Courtland. In Town of Court-land, Courtland operated the distribution of TVA electricity, oftentimes at a loss. The facts of that case are distinguishable from those of the present case, because here a municipality is taxing a cooperative, not another municipality. Accordingly, Town of Courtland is not dispositive of the issues presented in this case. The circuit court in Town of Courtland followed a federal district court’s declaratory judgment, which had relied upon City of Sheffield v. Town of Cherokee, No. 89-AR-5073-NW (N.D.Ala., Dec. 12, 1989). The continuing validity of our original holding in Town of Courtland, after our holding contrary to City of Sheffield today, is not at issue here, because this case involves only municipalities taxing cooperatives.

“1- [Sections] 37-6-1 through -30 Code of Alabama (1975).

“2- In addition to the municipal license taxes made the subject of this case, the State of Alabama, through its amicus curiae brief, represents to the Court that in 1992 the cooperatives paid $785,000.00 in state, county and municipal ad valorem taxes; $113,000.00 in state' and local use taxes; and for the tax year 1991-92 the cooperatives paid more than $3,079,000.00 in state utility license taxes.

“3- The supremacy clause of the United States Constitution, Art. VI, cl. 2, provides as follows: ‘This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ..., shall be the supreme Law of the Land....’
“In McCullough [M’Culloch] v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579, 609 (1819), the Supreme Court held that state governments ‘have no power, by taxation, or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress, to carry into effect the powers vested in the national government.’

“4 The defendant cooperatives seem to suggest that the local governments are receiving more through the TVA in-lieu-of-tax payments, than they would receive if the TVA were taxed as a privately owned power-generating business.
“Section 13 of the TVA Act provides a formula for in-lieu-of-tax payments by TVA, and establishes a minimum below which such payments may not fall. However, the minimum is based on the two-year average of ad valorem taxes for the ‘last two years during which said property was privately owned and operated.’
"There is nothing before the Court at this time to establish what the current ad valorem taxes would be, if TVA property were investor-owned, nor is there any evidence of the other tax revenues that the State and local governments would receive from TVA if it were an investor-owned utility. Therefore, any suggestion, or implication, that the in-lieu-of-tax revenue of the [local governments] is greater than it would be if TVA were investor-owned, is speculative.

“5 In the 1944 Tennessee Valley Authority Report to Congress on Section 13 of the TVA Act, TVA explained:
" ‘Municipal systems are exempt from federal taxes and from state and local levies in each of the six states affected, although payments in lieu of property taxes are provided for by legislative act in some instances. The power contracts and agreements, through which the TVA exercises its responsibilities for the distribution of electric power, make provision for payments by municipal systems in lieu of state and local property taxes.’ (p. 39)

“6 Town of Mulga v. Town of Maytown, 502 So.2d 731 (Ala. 1987).

“7. 16 U.S.C. 831. For the purpose of carrying out these general objectives, the TVA was granted the ‘power’ among others, to exercise the right of eminent domain in the name of the United States of America; to construct dams and operate power generating facilities.

“8- In City of Middlesboro v. Kentucky Utilities Co., 284 Ky. 833, 146 S.W.2d 48 (1940), the Court held that a Kentucky municipality could not validly enter into a standard TVA power contract, because a Kentucky statute vested the local authorities with ‘absolute and exclusive control’ of the utility system.

“9- In Tennessee Valley Authority v. Lenoir City, Tenn., 72 F.Supp. 457 (E.D.Tenn.1947), the Court held a municipal ordinance unconstitutional and invalid as violative of the municipalities’ power distribution contract with TVA, because the ordinance required the municipality to increase power rates contrary to the rate structure in the contract.

“10. xhe U.S. Supreme Court adopted what has come to be known as the Parker doctrine when, in 1943, it held that ‘nothing in the language of the Sherman Act or in its histoiy ... suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature.’ Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In the years since that opinion the contours of this exclusion have been constantly redefined. The Parker doctrine is not applied automatically, and a thoughtful analysis is called for in each case to ensure that it is a bona fide governmental decision for which the exemption is sought.

“11- Hearings on H.R. 7424 TO AMEND THE TENNESSEE VALLEY AUTHORITY ACT OF 1933, before the House Committee on Militaiy Affairs, January 23, 1940.

“12- Id. at 17-18.

“13- Hearings on S. 2925 TO AMEND THE TENNESSEE VALLEY AUTHORITY ACT OF 1933, before the Senate Subcommittee of the Committee on Agriculture and Forestry, February 23, 1940, p. 16.

“14 Hearings on S. 1796 TO AMEND THE TENNESSEE VALLEY AUTHORITY ACT OF 1933, before the House Subcommittee of the Committee on Military Affairs, June 5, 1939, p. 309.

“15 84 Congressional Record 10601, 10602 (1939).

“16- Hearings on H.R. 7424 TO AMEND THE TENNESSEE VALLEY AUTHORITY ACT OF *760 1933, before the House Committee on Military Affairs, January 23, 1940, pp. 209-10.

“17- Hearings on S. 2925 TO AMEND THE TENNESSEE VALLEY AUTHORITY ACT OF 1933, before the Senate Subcommittee of the Committee on Agriculture and Forestry, February 23, 1940, p. 8.

“18. 86 Congressional Record 5239 (1940).

“19. 1944 Tennessee Valley Authority Report to Congress on Section 13 of the TVA Act, p. 38.”